RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KELLY SERVICES, INC.; KELLY PROPERTIES, LLC,

*Plaintiffs-Appellees,*

*v.*

CREATIVE HARBOR, LLC,

*Defendant-Appellant.*

No. 16-1200

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-11249—Matthew F. Leitman, District Judge.

Argued: October 19, 2016

Decided and Filed: January 23, 2017

Before: KEITH, BATCHELDER, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Peter D. Gordon, PETER D. GORDON AND ASSOCIATES, Los Angeles, California, for Appellant. David P. Utykanski, HARNESS, DICKEY & PIERCE, P.L.C., Troy, Michigan, for Appellees. **ON BRIEF:** Peter D. Gordon, PETER D. GORDON AND ASSOCIATES, Los Angeles, California, for Appellant. David P. Utykanski, Brent G. Seitz, HARNESS, DICKEY & PIERCE, P.L.C., Troy, Michigan, for Appellees.

CLAY, J., delivered the opinion of the court in which KEITH, J., joined, and BATCHELDER, J., joined in part of the majority opinion. BATCHELDER, J. (pp. 27–30), delivered a separate opinion dissenting from part of the majority opinion and from the judgment.

---

**OPINION**

---

CLAY, Circuit Judge.  Defendant Creative Harbor, LLC ("Creative Harbor") appeals the judgment entered by the district court on February 1, 2016, voiding Creative Harbor's trademark applications numbered 86198230 and 86198309, respectively.  Creative Harbor challenges the district court's determinations that: (1) Creative Harbor lacked a *bona fide* intention to use its requested mark in commerce with respect to some of the goods and services identified in its trademark applications, in violation of § 1(b) of the Lanham Act, 15 U.S.C. § 1051(b); and (2) if Creative Harbor lacked such intent with respect to any of the goods and services, the applications must be voided in their entirety.  We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, we **AFFIRM IN PART** and **VACATE IN PART** the district court's judgment.  We **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

I.      **Factual History**

We present the facts in the light most favorable to Creative Harbor, against whom the district court entered summary judgment.  *See, e.g.*, *Green v. Brennan*, __ U.S. __, 136 S. Ct. 1769, 1774 (2016).

Defendant Creative Harbor is a California-based technology startup purportedly "engaged in the business of original content creation and concept development for all media, including but not limited to, internet, mobile, photography, film, and TV."  (R. 11, Answer, PageID #121.)  Creative Harbor was founded in 2014 by Christian Jurgensen ("Jurgensen"), who serves as Creative Harbor's owner, sole manager, and CEO.

Plaintiff Kelly Services, Inc. is a Michigan-based company that is allegedly "one of the world's largest providers of personnel and managed business services – staffing 99% of Fortune 100 companies and 90% of Fortune 500 companies."  (R. 1, Complaint, PageID #4.)  Plaintiff Kelly Properties, LLC, is an affiliated entity of Kelly Services, Inc.  Because Plaintiffs do not

assert separate claims or arguments, and have identical interests for the purposes of this appeal, we refer to them collectively as "Kelly Services."

In essence, the parties dispute which of them should have priority to the trademark WORKWIRE ("the Mark"), which both wish to use in connection with their competing employment-based software applications. In September 2013, Jurgensen allegedly developed an idea for a mobile application designed to connect employers with prospective employees. Jurgensen decided to call the application "WorkWire," and formed Creative Harbor in February 2014 to develop the WorkWire application. In early 2014, Creative Harbor hired an intellectual property attorney to explore obtaining the WORKWIRE trademark. That attorney allegedly advised Creative Harbor that the Mark was available.

However, in early 2013, Kelly Services allegedly began developing its own employment-based iPad application, which it intended to distribute through the Apple App Store. Kelly Services also decided to name its application "WorkWire." Kelly Services allegedly completed this iPad application on February 4, 2014, and submitted the application to Apple for its approval and eventual distribution. On February 17, 2014, Apple approved Kelly Services' application, but did not release it on the App Store immediately.

On February 19, 2014, Creative Harbor filed two trademark applications seeking rights to the Mark with the United States Patent and Trademark Office at 6:28 p.m. and 7:56 p.m. Eastern Standard Time, respectively ("the Applications"). The Applications sought the right to use the Mark in connection with thirty-six individually identified goods and services. Creative Harbor affirmed under penalty of perjury that it possessed a *bona fide* intention to use the Mark in commerce on or in connection with each of the goods and services listed in the Applications. On the same day, at approximately 8:11 p.m. Eastern Standard Time, Kelly Services' iPad application became available on the Apple App Store. A customer first downloaded the Kelly Services application on February 20, 2014.

On March 10, 2014, Creative Harbor sent Kelly Services a cease and desist letter asserting its right to use the Mark, and demanding that Kelly Services cease using the WORKWIRE name in connection with Kelly Services' Apple App Store iPad application.

Sixteen days later, Kelly Services responded to that letter by bringing suit against Creative Harbor in the United States District Court for the Eastern District of Michigan. In its complaint, Kelly Services sought a declaratory judgment, *inter alia*, that: (1) it possessed superior rights to the Mark; (2) it had not infringed on Creative Harbor's rights to the Mark; and (3) Creative Harbor's rights to the Mark were invalid.

On May 2, 2014, Creative Harbor answered the complaint and filed counterclaims against Kelly Services. Relevant to this appeal, Creative Harbor sought a declaratory judgment that it had priority rights to the Mark over Kelly Services because it filed the Applications before Kelly Services began using the Mark in commerce.

In roughly mid-August 2014, when the Patent and Trademark Office published the Applications for opposition, Kelly Services promptly opposed the applications, notified the Trademark Trial and Appeal Board ("TTAB") of the pending action before the district court, and moved to stay the TTAB proceedings pending resolution of the instant suit. The TTAB consolidated the oppositions and stayed the proceedings.

## II.     Procedural History

Kelly Services sought discovery related to various issues in the case, including Creative Harbor's intent to use the Mark in commerce with respect to each of the goods and services listed in the Applications. In response to Kelly Services' document requests, Creative Harbor produced a PowerPoint presentation that included mock-up "wireframes" (a concept map outlining the elements of a software application) for a potential iPhone application.

Kelly Services also deposed Jurgensen as Creative Harbor's representative pursuant to Federal Rule of Civil Procedure 30(b)(6). During the deposition, Kelly Services asked Jurgensen a number of questions related to Creative Harbor's plans to use the Mark in connection with the thirty-six goods and services identified in the Applications. In response to these questions, Jurgensen testified that Creative Harbor's outside attorney, David Sharifi, prepared the Applications under Jurgensen's instructions to "protect the mark" as to different products and services for which the Mark "could" eventually be used "in case the brand got bigger." (R. 56-1, Jurgensen Dep. Vol I, PageID #1477–78.) Accordingly, Jurgensen testified that he was not

personally aware of the particular reasons why Sharifi included particular goods and services in the Applications. Jurgensen elaborated that "some of these services might be of future importance. Some of these terms might protect my endeavors in the future that I have . . . with the brand . . . . We can go through every single [item], but I can also say to some of them this would have been a future use." (*Id.*)

Additionally, Jurgensen made several statements concerning the goods and services identified in the Applications. The court below summarized those statements as follows:

- Mr. Jurgensen said that the services and goods listed on the [Applications] 'were defined with the idea of protecting my present and *future exploration of this name—of this brand.*' (*Id.* PageID #1486);

- Mr. Jurgensen conceded that at the time his attorney drafted the [Applications] he (Jurgensen) 'had clear ideas for some of them, and *some of them were meant for future exploration.*' (*Id.* PageID #1481);

- Mr. Jurgensen acknowledged that some of the listed 'services *might* be of future importance' and that they '*might* protect my endeavors in the future that I have . . . .' (*Id.* PageID # 1477);

- In the [Applications], Creative Harbor stated that it intended to use the Mark with 'computer game software,' but Mr. Jurgensen testified that Creative Harbor did 'not' intend to use the Mark 'with a game.' (R. 56-2, Jurgensen Dep. Vol. II, PageID #1507);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'professional credentialing verification services . . . on behalf of others,' but Mr. Jurgensen acknowledged that he simply 'wanted *to keep the option open to at some point do that.*' (*Id.* PageID #1508-09);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'employee relations information services,' but when asked about that listing, Mr. Jurgensen did not know what it 'refers to.' (*Id.* PageID #1512);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'employment staffing consultation services,' and Mr. Jurgensen explained that Creative Harbor included this service because '*maybe at some point* [the WorkWire application] would have consulting in there, *maybe some kind of career advisor,* something like this.' (*Id.*);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'business consulting' services, but Mr. Jurgensen conceded that he 'wanted to make sure [that] was there included [sic]' because the company 'could' perhaps perform those services 'at some point' in the future. (*Id.* PageID #1509.)

*Kelly Servs., Inc. v. Creative Harbor, LLC*, 140 F. Supp. 3d 611, 617–18 (E.D. Mich. 2015) (*Kelly Servs. II*) (emphasis in original) (record citations altered).

On May 14, 2015, Creative Harbor moved for partial summary judgment seeking a declaration that it had priority to the Mark based on the Applications. Kelly Services opposed Creative Harbor's motion on the ground that the Applications were invalid because Creative Harbor lacked *bona fide* intent to use the Mark on some of the goods and services listed in the Applications, as required by § 1(b) of the Lanham Act. The district court construed Kelly Services' opposition as a cross-motion for summary judgment on the priority issue.

On August 21, 2015, the district court denied Creative Harbor's summary judgment motion. *Kelly Servs., Inc. v. Creative Harbor, LLC*, 124 F. Supp. 3d 768, 777–78 (E.D. Mich. 2015). The district court determined that the Applications themselves did not establish Creative Harbor's priority to the Mark; rather, the district court concluded, Creative Harbor needed to complete its registration by using the Mark in commerce before its priority rights would vest. *Id.* The district court thus acknowledged that "while Creative Harbor may establish its priority at some point in the future, it is not now entitled to the declaration that it seeks here." *Id.* at 778. Because the district court reasoned that Creative Harbor's remaining claims were dependent on the success of Creative Harbor's priority claim, the district court dismissed the balance of Creative Harbor's counter-claims. *Id.*

The district court delayed ruling on Kelly Services' cross-motion. Instead, the district court ordered supplemental briefing as to whether it "should (1) decide the validity of the [Applications] or (2) leave that issue to the TTAB and stay this action pending the TTAB's action on Kelly [Services'] Notices of Opposition." *Id.* at 779. Thereafter, the parties conferred and stipulated that the district court should determine the Applications' validity. The parties then filed supplemental briefing.

On October 16, 2015, the district court granted Kelly Services' cross-motion for summary judgment, voiding the Applications in their entirety. *Kelly Servs. II*, 140 F. Supp. 3d at 623. The district court concluded that there was no genuine issue of material fact that Creative Harbor lacked a *bona fide* intent to use the Mark as to some of the goods and services listed in its Applications. *Id.* at 618–19. After surveying TTAB precedent, the district court concluded that Creative Harbor's lack of *bona fide* intent as to some of the goods and services necessitated voiding the Applications in their entirety. *Id.* at 622.

Having won priority as to the Mark, Kelly Services voluntarily dismissed its remaining claims without prejudice. The district court thereafter entered a final judgment declaring, *inter alia*, that: (1) "Creative Harbor's trademark applications nos. 86198230 and 86198309 are invalid and void;" (2) "Kelly [Services] possesses priority to the trademark WORKWIRE that is superior to Creative Harbor;" and (3) "Creative Harbor has no valid or enforceable rights to the trademark WORKWIRE as against Kelly" Services. *Kelly Servs., Inc. v. Creative Harbor, LLC*, No. 14-cv-11249, 2016 WL 374102, at *1-3 (E.D. Mich. Feb. 1, 2016). On February 17, 2016, Creative Harbor filed a timely notice of appeal.

## DISCUSSION

On appeal, Creative Harbor argues that: (1) the district court erred in concluding that it lacked a *bona fide* intent to use the Mark in commerce with respect to some of the goods and services listed in the Applications at the time the Applications were filed; and (2) even if Creative Harbor did lack *bona fide* intent as to certain goods and services, the Applications should not have been voided in their entirety. We address each of these arguments in turn.

## I.     *Bona Fide* Intent

### A.     Standard of Review

We review *de novo* the district court's partial grant of summary judgment. *See, e.g.*, *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013). A movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court

may affirm a grant of summary judgment if the record, when viewed in the light most favorable to the non-movant, contains no genuine issues of material fact. *See, e.g.*, *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792 (6th Cir. 2004). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

### B.      Applicable Legal Principles

Section 1 of the Lanham Act creates two procedural mechanisms through which individuals or businesses can apply to register a trademark. First, under § 1(a), trademark owners can apply for protection of marks already being "used in commerce." 15 U.S.C. § 1051(a)(1); *see generally Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009).

Second, under § 1(b), a "person who has *a bona fide intention*, under circumstances showing the good faith of such person, *to use a trademark in commerce* may request registration of its trademark" by providing certain information and fees in an application to the Patent and Trademark Office. 15 U.S.C. § 1051(b)(1) (emphasis added). As the Federal Circuit has explained, while intent-to-use ("ITU") applicants "can begin the registration process having only a sincere intent" to later use the mark in commerce, "the [Lanham Act] also requires that applicants filing such intent-to-use applications must in due course either (i) file a verified statement of actual use of the mark, or (ii) convert the application into a use application." *M.Z. Berger & Co., Inc. v. Swatch AG*, 787 F.3d 1368, 1375 (Fed. Cir. 2015) (citing 15 U.S.C. § 1051(b)(3), (c), (d)); *see also Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356–57 (6th Cir. 1998) (describing the ITU application process under § 1(b)).

Two of our sister Circuits and the TTAB have held that "lack of a bona fide intent is proper statutory grounds on which to challenge a trademark application." *M.Z. Berger*, 787 F.3d at 1375; *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 21 (D.C. Cir. 2008);

*L'Oreal S.A. v. Marcon*, 102 U.S.P.Q.2d 1434, 2012 WL 1267956, at \*11 (T.T.A.B. 2012).**[1]** The parties do not contest that premise. More importantly, § 1(b) explicitly requires that an ITU applicant have a *bona fide* intent to use the mark in commerce as to the goods and services listed in the application. 15 U.S.C. § 1051(b)(1). We therefore join the Federal and D.C. Circuits and hold that a lack of *bona fide* intent is a proper ground on which to oppose an ITU application. *M.Z. Berger*, 787 F.3d at 1375; *Aktieselskabet*, 525 F.3d at 21 ("A bona fide intent is a statutory requirement of a valid trademark application under § 1(b), and the lack of such intent is therefore a ground on which Bestseller may oppose Fame's application.").

Although the Lanham Act does not define what constitutes a *bona fide* intent to later use a mark in commerce, the Federal Circuit has explained "that the applicant's intent must be demonstrable and more than a mere subjective belief." *M.Z. Berger*, 787 F.3d at 1375; *see also Lane Ltd. v. Jackson Int'l Trading Co.*, 33 U.S.P.Q.2d 1351, 1994 WL 740491, at \*6 (T.T.A.B. 1994) ("Thus, the determination of whether an applicant has a bona fide intention to use the mark in commerce is to be a fair, objective determination based on all the circumstances."); 3 *McCarthy on Trademarks* § 19.14, at 19.48 ("Congress did not intend the issue to be resolved simply by an officer of the applicant later testifying, 'Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future.'"). Accordingly, "whether an applicant had a 'bona fide intent' to use the mark in commerce at the time of the application requires *objective* evidence of intent." *M.Z. Berger*, 787 F.3d at 1376 (emphasis added). "Although the evidentiary bar is not high, the circumstances must indicate that the applicant's intent to use the mark was firm *and not merely intent to reserve a right in the mark.*" *Id.* (emphasis added). This determination must be made on a "case-by-case basis considering the

---

**[1]**Although both parties extensively cite TTAB decisions in their briefing before us, and essentially treat those decisions as controlling, neither party addresses the appropriate level of weight we should accord TTAB precedent. It appears that our sister Circuits have generally treated TTAB decisions as persuasive authority "entitled to respect" because of the TTAB's "expertise in trademark disputes." *See, e.g.*, *Rosenruist-Gestao E Servicios LDA v. Virgin Enters. Ltd.*, 511 F.3d 437, 459–60 (4th Cir. 2007); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 382 (2d Cir. 2005) (citing TTAB decisions); *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 443 (5th Cir. 2000) (same); *Gruma Corp. v. Mex. Restaurants, Inc.*, 497 F. App'x 392, 396 n.1 (5th Cir. 2012) (collecting cases treating TTAB decisions as persuasive authority). We note, however, that there may be a colorable argument that TTAB decisions should be accorded *Chevron* deference, at least in some circumstances. *See Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 994 F.2d 1569, 1571 (Fed. Cir. 1993) (giving *Chevron* deference to the TTAB's interpretation of the Lanham Act). For purposes of this appeal, we will assume, without deciding, that TTAB decisions should be treated as persuasive, but not controlling, authority.

totality of the circumstances," and may be assessed as of the time the application was filed. *Id.* "As a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment." *Honda Motor Co., Ltd. v. Winkelmann*, 90 U.S.P.Q.2d 1660, 2009 WL 962810, at *2 (T.T.A.B. 2009); *see also Smith v. Hudson*, 600 F.2d 60, 66 (6th Cir. 1979) ("[C]ases involving questions of motive or intent are normally not suited to disposition on summary judgment.").

"Neither the [Lanham Act] nor [its] legislative history indicates the specific quantum or type of objective evidence required to meet the bar" to show *bona fide* intent. *M.Z. Berger*, 787 F.3d at 1376. Drawing from the relevant legislative history, however, the TTAB has provided "several specific examples of objective circumstances which, if proven, 'may cast doubt on the bona fide nature of the intent or even disprove it entirely.'" *Lane*, 1994 WL 740491, at *6 (quoting S. Rep. No. 100-515, at 23 (1988)).

> For example, the applicant may have filed numerous intent-to-use applications to register the same mark for many more new products than are contemplated, numerous intent-to-use applications for a variety of desirable trademarks intended to be used on [a] single new product, numerous intent-to-use applications to register marks consisting of or incorporating descriptive terms relating to a contemplated new product, numerous intent-to-use applications to replace applications which have lapsed because no timely declaration of use has been filed, an excessive number of intent-to-use applications to register marks which ultimately were not actually used, an excessive number of intent-to-use applications in relation to the number of products the applicant is likely to introduce under the applied-for marks during the pendency of the applications, or applications unreasonably lacking in specificity in describing the proposed goods. Other circumstances may also indicate the absence of genuine bona fide intent to actually use the mark.

*Id.* (quoting S. Rep. No. 100-515, at 23–24).

Further, one prominent practitioner has recently compiled a list of "affirmative activities that have been deemed indicative of the *presence* of a bona fide intent to use," including:

- conducting a trademark availability search;
- performing preparatory graphic design work or labeling on sales material for a product;
- using a mark in test marketing;

- testimony regarding informal, unwritten business plans or market research;

- obtaining necessary regulatory permits;

- obtaining a correlative domain name for the mark or setting up a website;

- making contacts with individuals who might help develop a business;

- correspondence mentioning the planned use of the mark;

- attempts to find licensees, including ones outside of the U.S.; [and]

- obtaining commercial space in which to perform the services.

*See* Sandra Edelman, *Proving Your Bona Fides—Establishing Bona Fide Intent to Use Under the U.S. Trademark (Lanham) Act*, 99 Trademark Rptr. 763, 781–82 (2009) (footnotes omitted) (emphasis in original).

On a motion for summary judgment in an action challenging an ITU application for lack of *bona fide* intent, the party opposing the application ("opposing party" or "opposer") "has the initial burden of demonstrating by a preponderance of the evidence that [the] applicant lacked a bona fide intent to use the mark on the identified goods." *Bos. Red Sox Baseball Club LP v. Sherman*, 88 U.S.P.Q.2d 1581, 2008 WL 4149008, at *6 (T.T.A.B. 2007); *see also Intel Corp. v. Emeny*, 2007 WL 1520948, at *4 (T.T.A.B. May 15, 2007) (unpublished) ("If we determine that opposer has established a *prima facie* case that applicant's application is invalid for lack of the requisite bona fide intention to use its mark, the burden then shifts to applicant to come forward with evidence to refute such a case."). Once this showing is made, the applicant must either come forward with objective documentary evidence demonstrating *bona fide* intent, or else provide "other facts . . . which adequately explain or outweigh [the] applicant's failure to provide such documentary evidence." *Honda Motor Co.*, 2009 WL 962810, at *2. Without a valid excuse, the "absence of any documentary evidence on the part of an applicant regarding [bona fide intent] constitutes objective proof sufficient to prove that the applicant lack[ed] a bona fide intention to use its mark in commerce." *Bos. Red Sox*, 2008 WL 4149008, at *6 (citing *Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha Opp'n*, 26 U.S.P.Q.2d 1503, 1507 (T.T.A.B. 1993)). "While the burden to produce evidence shifts, the burden of persuasion by a preponderance of the evidence remains with the party asserting a lack of a bona fide intention to use." *Intel Corp.*, 2007 WL 1520948, at *4.

**C.　　Analysis**

Creative Harbor argues that the evidence in the record shows that it had a *bona fide* intent to use the Mark in connection with each and every one of the thirty-six goods and services listed in the Applications at the time they were filed.  We disagree.

### 1. *Prime Facie* Showing of Lack of *Bona Fide* Intent

As the party challenging Creative Harbor's Applications, Kelly Services bore "the initial burden of demonstrating by a preponderance of the evidence that [Creative Harbor] lacked a bona fide intent to use the mark on the identified goods."  *Bos. Red Sox*, 2008 WL 4149008, at *6.  We hold that Kelly Services met this initial burden.

As the district court correctly found, Jurgensen's deposition testimony on behalf of Creative Harbor was sufficient to demonstrate by a preponderance of the evidence that Creative Harbor lacked *bona fide* intent to use the Mark as to at least some of the goods and services identified in the Applications at the time the Applications were filed.  The district court and Kelly Services specifically reference the following portions of Jurgensen's deposition:

- Mr. Jurgensen testified that he asked his attorney to file the [Applications] in order 'to protect this brand . . . *in case the brand got bigger; in case it diversifies a little bit.*'  (R. 56-1, PageID #1478);

- Mr. Jurgensen said that the services and goods listed on the [Applications] 'were defined with the idea of protecting my present and *future exploration of this name—of this brand.*'  (*Id.* PageID #1486);

- Mr. Jurgensen conceded that at the time his attorney drafted the [Application] he (Jurgensen) 'had clear ideas for some of them, and *some of them were meant for future exploration.*'  (*Id.* PageID #1481);

- Mr. Jurgensen acknowledged that some of the listed 'services *might* be of future importance' and that they '*might* protect my endeavors in the future that I have . . . .'  (*Id.* PageID # 1477);

- In the [Applications], Creative Harbor stated that it intended to use the Mark with 'computer game software,' but Mr. Jurgensen testified that Creative Harbor did 'not' intend to use the Mark 'with a game.'  (R. 56-2, PageID #1507);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'professional credentialing verification services . . . on

behalf of others,' but Mr. Jurgensen acknowledged that he simply 'wanted *to keep the option open to at some point do that*.' (*Id.* PageID #1508–09);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'employee relations information services,' but when asked about that listing, Mr. Jurgensen did not know what it 'refers to.' (*Id.* PageID #1512);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'employment staffing consultation services,' and Mr. Jurgensen explained that Creative Harbor included this service because '*maybe at some point* [the WorkWire application] would have consulting in there, *maybe some kind of career advisor*, something like this.' (*Id.*);

- In the [Applications], Creative Harbor said that it intended to use the Mark in connection with 'business consulting' services, but Mr. Jurgensen conceded that he 'wanted to make sure [that] was there included' because the company 'could' perhaps perform those services 'at some point' in the future. (*Id.* PageID #1509.)

*Kelly Servs. II*, 140 F. Supp. 3d at 617–18 (emphasis in original) (record citations altered).

These excerpts establish that Creative Harbor did not have a "firm" intention to use the Mark in connection with computer software games, professional credentialing verification services, employee relations information services, employment staffing consultation services, and business consulting services—all goods and services listed in the Applications. *See M.Z. Berger*, 787 F.3d at 1376. Moreover, several of Jurgensen's other statements strongly suggest that Creative Harbor included some goods and services in the Applications merely to "reserve a right in the mark" in case it ever decided to expand its commercial activities into those areas. *Id.* Jurgensen's statement that, at the time the Applications were filed, Creative Harbor "had clear ideas for some of [the goods and services], and *some of them were meant for future exploration*" is particularly indicative of Creative Harbor's lack of firm intent. Creative Harbor was not permitted to claim the Mark for uses that might only materialize after some unspecified "future exploration"—it was required to have firm plans to use the Mark at the time the Applications were filed. *M.Z. Berger*, 787 F.3d at 1376. Taking all of Jurgensen's statements together, we are persuaded that the district court was correct in concluding that Kelly Services carried its initial burden in showing that it was more likely than not that Creative Harbor lacked *bona fide* intent as to some of the goods and services listed in the Applications. *See Bos. Red Sox*, 2008 WL

4149008, at *6 (holding that opposing party carried its initial burden to undermine *bona fide* intent where the applicant claimed the mark for a wide array of products, and produced no discovery evidence that it had a genuine commercial capacity to produce all of those products).

Creative Harbor challenges the district court's conclusion that Kelly Services carried its initial burden of production by arguing that the district court was not entitled to consider Jurgensen's deposition testimony. Creative Harbor appears to argue that Jurgensen's deposition testimony was inadmissible hearsay, and that the district court erred in considering the testimony as an admission against interest.

However, Creative Harbor failed to raise its evidentiary challenge to the consideration of Jurgensen's deposition testimony in its briefing before the district court; it has thus waived the right to make that argument on appeal. *See, e.g.*, *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997) ("It is well-settled that this court will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice."). In any event, the argument is without merit. Jurgensen is Creative Harbor's founder, owner, sole manager, and CEO—for all practical purposes, he *is* Creative Harbor. Federal Rule of Civil Procedure 32(a)(3) allows an adverse party—like Kelly Services—to "use *for any purpose* the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." (emphasis added). As Creative Harbor's CEO—and Rule 30(b)(6) deponent—Jurgensen's testimony was binding on Creative Harbor, and the district court did not err in considering it. *See* Charles A. Wright et al., *Federal Practice and Procedure* § 2143 (3d ed. 2016) (explaining that "Rule 32(a) creates of its own force an exception to the hearsay rule"); *see also, e.g.*, *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015) (explaining that an organization's Rule 30(b)(6) depositions are "'binding' in the sense that whatever its deponent says can be used against the organization"); *cf.* Fed. R. Evid. 801(d)(2)(c) (declaring that a statement by a "party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is "not hearsay").

Accordingly, we hold that Kelly Services met its initial burden of production to show that Creative Harbor lacked *bona fide* intent as to some of the goods and services listed in the Applications.

### 2. Rebuttal Evidence

Once Kelly Services met its initial burden of production, Creative Harbor was required to come forward with either objective documentary evidence establishing its *bona fide* intent, or facts supporting a sound explanation as to why such evidence was lacking. *Honda Motor Co.*, 2009 WL 962810, at *2. We hold that Creative Harbor provided sufficient objective evidence as to some of the goods and services listed in the Applications, but not others.

In its summary judgment briefing, and again on appeal, Creative Harbor marshals significant evidence demonstrating its *bona fide* intent. A representative sample of Creative Harbor's evidence includes:

- Its hiring of a computer program development firm to develop an employment-based software application for Apple's "App Store." (R. 48-33, App Developer Agreement);

- A trademark search it purportedly conducted to determine whether the WORKWIRE name was available. (R. 58-3, Jurgensen Supp. Decl., ¶ 19);

- The wireframes it developed for its proposed employment-based software application. (*Id.* ¶¶ 10–13);

- Its business plans for the proposed application. (R. 65-5, 5 Year Business Plan);

- Its obtaining of the www.work-wire.com domain name. (R. 48-20, Domain Registration); and

- Its press release regarding its employment-based software application. (R. 48-22, Press Release.)

The district court correctly acknowledged that Creative Harbor's evidence "makes clear" that Creative Harbor had a *bona fide* intent as to some of the goods and services listed in the Applications. *Kelly Servs. II*, 140 F. Supp. 3d at 618. For example, the district court noted "that Creative Harbor had a 'firm' intent to use the Mark in connection with an iPhone application that connected job seekers with employers." *Id.* We agree with the district court, however, that Creative Harbor's evidence ultimately "misses the mark." *Id.*

As the district court correctly noted, "evidence that Creative Harbor intended to use the Mark with respect to *some* of the goods and services listed in the [Applications] does not contradict Kelly [Services'] evidence that Creative Harbor *lacked* a firm intent to use the Mark on several of the *other* services and goods listed in the [Applications.]" *Id.* (emphasis in original). Creative Harbor, for example, failed to come forward with any objective evidence showing a *bona fide* intent to use the Mark in connection with computer software games, professional credentialing verification services, employee relations information services, employment staffing consultation services, and business consulting services—the goods and services most fatally undermined by Jurgensen's deposition testimony. Nor did Creative Harbor offer any reasons excusing its failure to come forward with such objective evidence. The "absence of any documentary evidence on the part of an applicant regarding [bona fide] intent constitutes objective proof sufficient to prove that the applicant lacks a bona fide intention to use its mark in commerce." *Bos. Red Sox*, 2008 WL 4149008, at \*6; *Spirits Int'l, B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 U.S.P.Q.2d 1545, 2011 WL 2909909, at \*3 (T.T.A.B. 2011) (same).

Accordingly, we hold that Creative Harbor lacked a *bona fide* intent to use the Mark in connection with at least some of the goods and services listed in the Applications.

## II.     Remedy

The parties disagree as to the appropriate remedy for when an ITU applicant has a *bona fide* intent to use a mark in commerce on some, but not all, of the goods and services listed in her application. Kelly Services argues, and the district court found, that the correct remedy is to void the application in its entirety unless the applicant voluntarily deletes the challenged goods and services before the dispute is substantially litigated. Creative Harbor, by contrast, argues that the Applications should not be void, but rather the court should delete the offending goods and services from the application and allow the remainder to proceed towards registration. We agree with Creative Harbor that the district court erred in voiding the Applications in their entirety.

**A.    Standard of Review**

We review *de novo* the district court's interpretation of another jurisdiction's precedents, *see Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991), as well as its interpretation of the Lanham Act.  *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004).

**B.    Analysis**

Both parties marshal TTAB precedent in favor of their preferred remedy.  Creative Harbor relies on three cases—*Grand Canyon West Ranch LLC v. Hualapai Tribe*, 78 U.S.P.Q.2d 1696, 2006 WL 802407 (T.T.A.B. 2006), *The Wet Seal, Inc. v. FD Management, Inc.*, 82 U.S.P.Q.2d 1629, 2007 WL 458529 (T.T.A.B. 2007), and *Syndicat Des Proprietaires Viticulteurs de Chateauneuf-du-Pape v. Pasquier DesVignes*, 107 U.S.P.Q.2d 1930, 2013 WL 5407284, at *1 (T.T.A.B. 2013)—in arguing that it should have the opportunity to cure its overbroad Applications.

In *Grand Canyon*, unlike Creative Harbor in this case, the applicant submitted a use-based trademark application under § 1(a) of the Lanham Act.  2006 WL 802407, at *1.  The opposing party argued that because the applicant did not use the mark for all of the services listed in the application, the application must be voided in its entirety.  *Id.* at *1.  In rejecting this argument, the TTAB drew a distinction "between situations in which an applicant has committed fraud, or has not used the mark on any of the goods or services identified in its application," and cases "in which the opposer claims only that [the] applicant did not use its mark in connection with some of the services identified in its application as of the filing of the application."  *Id.* at *3.  While the harsh remedy of voiding the application was appropriate in the former two situations, the TTAB held that it was "inappropriate" for the latter.  *Id.*; *see also id.* at *1 ("[W]e hold that as long as the mark was used on some of the identified goods and services as of the filing of the application, the application is not void in its entirety.").  Rather, the TTAB held that applicants that have used the mark in connection with some of the goods or services identified in their applications, but not others, "may 'cure' this problem by amending" their applications to delete the offending goods and services.  *Id.* at *3.  Accordingly, the TTAB granted the applicant's pending motion to amend its overbroad application.  *Id.*

The next year, in *Wet Seal*, the TTAB considered *Grand Canyon*'s holding in the context of a § 1(b) ITU application. There, the opposing party challenged some of the uses claimed in the applicant's ITU application for lack of *bona fide* intent, and argued that the entire application should be voided. 2007 WL 458529, at *2. The TTAB held that the opposing party's evidence failed to establish a lack of *bona fide* intent. *Id.* at *14. Earlier in the opinion, however, the TTAB addressed the opposing party's argument that the entire application should be void if some of the claimed uses were found to lack *bona fide* intent. Citing *Grand Canyon*, the TTAB observed that "contrary to opposer's contention, an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them." *Id.* at *2 (footnote omitted). "Thus," the TTAB continued, "we will decide this issue in terms of whether the items, if any, for which opposer has shown applicant's lack of bona fide intention to use the mark should be deleted from the application." *Id.*

Finally, in *Syndicat*, the applicant conceded that it lacked *bona fide* intent as to certain goods listed in its § 1(b) ITU application. 2013 WL 5407284, at *1. The TTAB accordingly ordered those goods deleted from the application. *Id.* at *15. In so doing, the TTAB quoted *Wet Seal*'s statement that "an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them." *Id.* (quoting *Wet Seal*, 2007 WL 458529, at *2).

Notwithstanding this authority, Kelly Services argues, and the district court agreed, that applicable rule was articulated in *Spirits International, B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 U.S.P.Q.2d 1545, 2011 WL 2909909 (T.T.A.B. 2011). There, the opposing party challenged for lack of *bona fide* intent an application for a trademark to be used in connection with both alcoholic and non-alcoholic beverages. *Id.* at *1. Although the opposing party's arguments focused on the "applicant's lack of a bona fide intention to use its mark for alcoholic beverages, the opposition was brought against all the goods" listed in the application. *Id.* at *2 n.3. After the opposing party met its initial burden of production, the "applicant submitted no evidence whatsoever, nor did it file a brief" in response. *Id.* at *4. The

TTAB accordingly held that the applicant had "failed to rebut the opposer's evidence," and voided the entire application. *Id.*

In a footnote, the TTAB stated that "to the extent that opposer is successful in proving . . . lack of bona fide intention to use the mark with respect to any of the goods in each class, specifically alcoholic beverages, the opposition against the classes in their entirety would be sustained." *Id.* at *2 n.3. The TTAB continued that "if [the] applicant believed that opposer's objection to registration of the mark was limited to the alcoholic beverages listed in the identification of each class[,] . . . [the] applicant could have moved to delete alcoholic beverages from its identification if applicant did not have a bona fide intention to use its mark in commerce with respect to such goods, but did with respect to the non-alcoholic beverages." *Id.*

At bottom, the parties' dispute is centered on which TTAB statement should direct the remedy here: *Spirits International*'s statement that "to the extent that opposer is successful in proving . . . lack of bona fide intention to use the mark with respect to any of the goods in each class . . . the opposition against the classes in their entirety would be sustained," 2011 WL 2909909, at *2 n.3, or *Wet Seal* and *Syndicat*'s statement that "an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them." *Wet Seal*, 2007 WL 458529, at *2. After a close review of the relevant precedents, we conclude that Kelly Services and the district court misread *Spirits International*, and the more forgiving rule articulated in *Grand Canyon* should be applied here.

> The disputed text and footnote of *Spirits International* reads as follows:

> With respect to the lack of bona fide intent to use ground, opposer asserts that applicant has not produced any documents in response to opposer's requests for production of documents that might support applicant's allegations of a bona fide intention to use the mark MOSKINISI, nor has applicant provided any information of such an intent in response to opposer's interrogatories seeking such information, and that on information and belief applicant does not and never has had a bona fide intention to use the mark MOSKINISI in commerce in connection with any alcoholic products.[3]

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

[3]Although the notice of opposition refers specifically to the likelihood of confusion with respect to applicant's use of the mark for alcoholic beverages, and applicant's lack of a bona fide intention to use its mark for alcoholic beverages, the opposition was brought against all the goods in Classes 32 and 33. *Therefore, to the extent that opposer is successful in proving likelihood of confusion or lack of a bona fide intention to use the mark with respect to any of the goods in each class, and specifically alcoholic beverages, the opposition against the classes in their entirety would be sustained.* In this connection, if applicant believed that opposer's objection to registration of the mark was limited to the alcoholic beverages listed in the identification of each class, it could have availed itself of the divisional procedure, as it did when it requested that Classes 1, 2, 3, 29, 30, 39 and 40 be divided out from the application. *Or, with respect to the lack of a bona fide intent to use ground, applicant could have moved to delete alcoholic beverages from its identification if applicant did not have a bona fide intention to use its mark in commerce with respect to such goods, but did with respect to the non-alcoholic beverages.* Although all of the goods in Class 33 are alcoholic beverages, applicant's identified goods in Class 32 include both alcoholic beverages and non-alcoholic items. Opposer could then have determined whether it wished to contest the division and/or proceed with the opposition in connection with non-alcoholic beverages as well as alcoholic beverages, or whether a registration could have issued for the non-alcoholic beverages in Class 32. Compare, Grand Canyon West Ranch LLC v. Hualapai Tribe, 78 USPQ2d 1696 (TTAB 2006), in which an opposition was brought, inter alia, on the ground that the applicant had not used its mark on all of the identified services as of the filing date of the use-based application and the application was therefore void ab initio. Prior to trial applicant filed a motion to amend its identification to delete certain services for which the opposer claimed that applicant did not use the mark; the Board granted applicant's motion, and denied opposer's motion for summary judgment with respect to the services remaining in the application.

*Spirits Int'l*, 2011 WL 2909909, at *2 n.3 (emphasis added). The district court viewed the italicized passages as holding that when an applicant lacks a *bona fide* intent to use some, but not all of the goods and services listed in a § 1(b) ITU application, the entire application must be voided unless the applicant voluntarily deletes the overbroad portions of the applications when challenged. *Kelly Servs. II*, 140 F. Supp. 3d at 622.

In full context, however, the more accurate reading is that the TTAB explained: (1) the consequences of the applicant's failure to provide any rebuttal evidence in light of the TTAB's well-established summary judgment procedure for *bona fide* intent challenges to ITU

applications; and (2) how the applicant could have avoided having the *bona fide* intent challenge risk his trademark as applied to the non-alcohol beverages listed in the application.

Recall that the TTAB utilizes a two-step burden shifting framework: if the opposing party makes a *prima facie* showing that the applicant lacked *bona fide* intent, the burden shifts to the applicant to come forward with objective evidence showing *bona fide* intent, or a good reason why such evidence is lacking. *Sprits Int'l*, 2011 WL 2909909, at *3–4 (citing *Bos. Red Sox*, 2008 WL 4149008, at *6, and *Commodore Elecs.*, 26 U.S.P.Q.2d at 1507). The text immediately preceding Footnote 3 notes that the applicant in *Spirits International* did not come forward with any rebuttal evidence when the opposing party challenged its *bona fide* intent. *Id.* at *2. Footnote 3 then explains the import of this omission. The challenge was brought against all beverage classes contained in the application. *Id.* at *2 n.3. Because the applicant offered no rebuttal evidence, under the TTAB's burden shifting framework, if the opposing party was "successful in proving . . . lack of a bona fide intention to use the mark with respect to any of the goods in each class, and specifically alcoholic beverages"—in other words, if the opposing party successfully put forward a *prima facie* showing of lack of *bona fide* intent—then "the opposition against the classes in their entirety would be sustained" because the challenge applied to all goods and services, and the applicant did not come forward with rebuttal evidence as to *any of the goods and services*. *Id.*

The TTAB then explains how the applicant could have limited the scope of his exposure to just the alcoholic beverages listed in his application, *i.e.*, the goods the opposing party specifically focused on in its challenge. *Id.* The TTAB explains that the applicant could have either: (1) used the TTAB's "divisional procedure" to separate the non-alcoholic and alcoholic beverages into distinct applications; or (2) voluntarily deleted the alcoholic goods listed in its application. *Id.* Nowhere in the opinion does the TTAB say that an applicant can only save an overbroad application by deleting the challenged goods and services before a tribunal litigates the applicant's *bona fide* intent.

In sum, the TTAB voided the entire application in *Spirits International* because the opposing party put the entire application at issue in its opposition, made a *prima facie* showing that the applicant lacked *bona fide* intent, and the applicant failed to produce any evidence that it

had a *bona fide* intent as to any of the goods and services listed in the application. *Id.* at *2 n.3; 3–4. As Creative Harbor correctly notes, *Spirits International* was nothing more than a straightforward application of the well-established principle that the "absence of any documentary evidence on the part of an applicant regarding [bona fide] intent constitutes objective proof sufficient to establish that the applicant lacks a bona fide intention to use its mark in commerce." *Id.* at *3. The decision did not create a new rule that for § 1(b) ITU applications, as opposed to the § 1(a) use applications identified in *Grand Canyon,* overbroad applications are presumptively voidable unless the applicant voluntarily deletes challenged goods and services from its application upon request.

Several considerations buttress our interpretation of *Spirits International.* First, contrary to the district court's suggestion, this interpretation better harmonizes *Spirits International* with *Grand Canyon.* *Grand Canyon*'s core holding was that, in the context of § 1(a) use applications, the harsh remedy of voiding an application entirely was "inappropriate" in cases where "the mark was used on some of the identified goods or services as of the filing of the application." *Grand Canyon*, 2006 WL 802407, at *1, 3. This holding rested on the "clear distinction between the situations in which an applicant has committed fraud, or has not used the mark on any of the goods or services identified in its application,"[2] where voiding the application is appropriate, and a situation in which the "opposer claims only that applicant did not use its mark in connection with some of the services identified in its application as of the filing of the application," where the applicant's conduct is far less egregious. *Id.* at *3. It did not, as the district court found, rest on the applicant's willingness to delete the offending goods and services prior to adjudication by a tribunal. *Kelly Servs. II*, 140 F. Supp. 3d at 621–22. Given *Grand Canyon*'s strong holding against voiding applications where the applicant has not committed egregious misconduct, it would have been odd indeed for the TTAB in *Spirits International* to have cited *Grand Canyon* while adopting the opposite rule in the § 1(b) ITU context without any reasoning explaining why it departed from *Grand Canyon*'s approach. *See Spirits Int'l*, 2011 WL 2909909, at *2 n.3.

---

[2]The analogous situation in the § 1(b) ITU context would be where the applicant lacks *bona fide* intent as to all of the goods and services identified in the application. *See Spirits Int'l*, 2011 WL 2909909, at *3.

Second, the TTAB's citation to *Wet Seal*'s language in *Syndicat* that "an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them," casts significant doubt on the district court's interpretation of *Spirits International*. *Syndicat*, 2013 WL 5407284, at *15 (quoting *Wet Seal*, 2007 WL 458529, at *2). It would have been extremely puzzling for the TTAB to cite its *Wet Seal* statement reiterating the *Grand Canyon* rule if it had rejected that rule just two years earlier in *Spirits International*.

Finally, the district court's interpretation would lead to perverse results. Imagine a hypothetical § 1(b) ITU applicant who submits an application listing 100 goods associated with the requested mark with a subjective intention to use the mark in connection with all of the goods. The hypothetical applicant has at least some objective documentary evidence supporting its *bona fide* intent as to all 100 goods, but a competitor nevertheless challenges the applicant's *bona fide* intent as to ten of the goods in a declaratory action in federal district court. Under the district court and Kelly Services' interpretation of *Spirits International*, the applicant is put in quite a quandary: he must either (1) voluntarily delete the challenged goods,[3] even if the challenges lack merit; or (2) risk having his entire application voided if the district court determines that he lacked *bona fide* intent for even a single item. If the applicant lacks ironclad documentary evidence for even one item—which is likely in circumstances where the application lists a large number of goods and services—his incentive is to delete the challenged goods rather than risk losing the entire application. Similarly, his competitor is incentivized to bring *bona fide* intent challenges to all of the applicant's future applications, because the competitor can likely bully the applicant into at least some concessions, and the only consequence for the competitor if it loses is legal fees, which may be a relative pittance depending on the industry

---

[3]Neither Kelly Services nor the dissent explain how a reviewing court would determine whether an applicant's offer to delete the overbroad portions of his application is sufficient to avoid voiding the application entirely. For instance, at what point in time did Creative Harbor's opportunity to cure its Applications expire? Was it permitted to assert that it could prove *bona fide* intent as to some of the goods and services challenged by Kelly Services, or was it required to entirely capitulate and delete any item Kelly Services specified? We find these ambiguities all the more reason to reject the rule proposed by Kelly Services and the dissent. It is it difficult to see what purpose of the Lanham Act is served by requiring an applicant to risk his entire application if he wishes to defend his *bona fide* intent in good faith before the TTAB or a federal court.

and the value of the mark. If the TTAB intends this result, at a minimum, it is fair to ask that it say so explicitly, as opposed to adverting to the rule in passing in a footnote.[4]

Kelly Services argues that *Wet Seal* and *Syndicat*'s statements applying *Grand Canyon*'s reasoning in the context of § 1(b) ITU applications should not be followed as dicta. It is true that neither of those cases ultimately needed to apply a remedy, and therefore their statement that "an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them," is dicta. *See United States v. Wynn*, 579 F.3d 567, 577 (6th Cir. 2009) ("A statement in a case can be considered dicta if it 'was not necessary to the determination of the issue on appeal.'" (quoting *United States v. Hardin*, 539 F.3d 404, 411 (6th Cir. 2008)). As the Federal Circuit has observed, however, the fact that a court is not bound by dicta "does not mean" that the dicta "is incorrect." *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007). At a minimum, *Wet Seal* and *Syndicat* strongly indicate that the TTAB views *Grand Canyon*'s holding as controlling in the § 1(b) ITU application context. And more importantly, we see no reason why *Grand Canyon*'s compelling and well-reasoned rationale should not apply equally to both § 1(a) and § 1(b) applications.

---

[4]The dissent notes that in *Bryan Papé and Spello Group, LLC v. Me To We Social Enterprises, Inc.*, 2016 WL 1642754, at *4 (T.T.A.B. Feb. 29, 2016) (footnote omitted), an unpublished opinion involving a § 1(b) ITU application, the TTAB cited *Sprits International* for the proposition that a "lack of a bona fide intention to use the mark with respect to any of the goods or services in a class results in sustaining the Opposition against all the goods or services in that class." The dissent uses *Bryan Papé* and another non-precedential § 1(a) case, *Yazhong Inv. Ltd. v. Multi-Media Tech. Ventures, Ltd.*, 2015 WL 9913815, at *3 n.8 (T.T.A.B. Dec. 18, 2015), to argue that, since *Grand Canyon*, the TTAB has consistently held that overbroad applications must be voided in their entirety unless the applicant voluntarily files a motion to delete the offending goods and services. Post at 1–3. However, the TTAB's statement in *Bryan Papé* stands in stark contrast to the TTAB's dicta in *Wet Seal* and *Syndicat* that "an application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them." *Syndicat*, 2013 WL 5407284, at *15 (quoting *Wet Seal*, 2007 WL 458529, at *2). These statements directly contradict one another, and are flatly irreconcilable. The TTAB thus has no consistent approach for us to defer to, and we are left with the task of attempting to harmonize cases that are in tension with one another. For the reasons explained above, we disagree with the dissent that *Spirits International* held that ITU applications are void *ab initio* if the applicant lacks intent to use any of the goods or services listed therein, and believe that our approach best harmonizes *Spirits International* and *Grand Canyon*, and provides the more sensible legal rule. Moreover, we also think it better to adopt the approach suggested by *Wet Seal* and *Syndicat*, two precedential TTAB decisions, over the approach suggested by *Bryan Papé*, a non-precedential decision—particularly since the statement in *Bryan Papé* was also arguably dicta because the TTAB did not ultimately apply a remedy in that case. *See Bryan Papé*, 2016 WL 1642754, at *4.

Kelly Services counters that if a court can simply delete the offending goods and services from an overbroad application, applicants have no incentive to carefully draft their applications, and will be able to simply "squat" on trademarks for up to three years at a time. While there is some persuasive force to this argument, this consequence seems less severe than the contrary rule. An applicant whose application is voided may, as in this case, lose his priority to the trademark forever as against a key competitor. Weighed against that outcome, the potential for abusive squatting is less compelling.

Accordingly, we hold that when a § 1(b) ITU applicant lacks *bona fide* intent as to some, but not all, of the goods and services listed in her application, the application should not be voided in its entirety absent fraud or other egregious conduct. *Grand Canyon*, 2006 WL 802407, at *1–3. Rather, the court should determine as to which goods and services the applicant lacked *bona fide* intent, and excise the overbroad portions of the application. We thus hold that the district court erred in voiding Creative Harbor's Applications in their entirety.

## III.    Remand

At oral argument, Creative Harbor requested that we eschew remand to the district court, and enter an order deleting the overbroad portions of the Applications. However, because the district court erroneously determined that any overbreadth in Creative Harbor's Applications necessitated voiding the Applications in their entirety, it never generated a complete list of all of the goods and services for which Creative Harbor lacked *bona fide* intent. Likewise, the parties have not addressed which goods and services should be excised from the Applications in their appellate briefing. Because determining which items to eliminate from the Applications will likely involve a detailed examination of the record, and necessitate additional briefing from the parties, the district court is best positioned to conduct this inquiry. We therefore decline Creative Harbor's request and remand this case to the district court to determine in the first instance which items should be deleted from the Applications. *See, e.g., White v. Burlington N. & Santa Fe R.R. Co.*, 364 F.3d 789, 808 (6th Cir. 2004) (finding remand appropriate where consideration of the remaining issues required "a careful examination of the entire record").

On remand, the district court should evaluate each of the thirty-six goods and services listed in the Applications, and make individualized determinations as to whether Creative Harbor's objective documentary evidence establishes a *bona fide* intention to eventually use those items in commerce.[5] The district court may wish to conduct an evidentiary hearing in service of this inquiry, although we do not require it to do so.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's determination that Creative Harbor lacked *bona fide* intent as to some, but not all of the goods and services listed in the Applications. We hold, however, that the district court erroneously voided the Applications in their entirety, and **VACATE** the district court's judgment. We **REMAND** with instructions for the district court to determine which goods and services were improperly included in the Applications, and excise the improper items. We do not limit the district court's ability to conduct additional appropriate proceedings consistent with this opinion.

---

[5]In an appropriate case, where the disputed applications list a particularly large number of goods and services, district courts may find it feasible to determine *bona fide* intent by reference to representative examples. However, because the Applications at issue here list only thirty-six goods and services, we think the better approach in the instant case is for the district court to issue individual findings regarding Creative Harbor's *bona fide* intent as to each of the items listed in the Applications.

---

**CONCURRING IN PART AND DISSENTING IN PART AND FROM THE JUDGMENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part and dissenting from the judgment. While I agree with my colleagues that Kelly Services met its burden of production and that Creative Harbor failed to demonstrate a bona fide intent to use the Mark in connection with at least some of the goods and services listed in its ITU applications, I disagree with their proposed remedy and disposition of this case. Accordingly, I respectfully dissent from the judgment.

Although the majority opinion provides a more-or-less accurate summary of the inconsistent landscape of TTAB precedent that has led to the dispute in this appeal, it overlooks some distinguishing facts that support the district court's opinion. A more in-depth review of *Grand Canyon* would be helpful, even though that case concerned § 1(a) use applications. In *Grand Canyon*, the TTAB held that in the absence of fraud, "an applicant who bases its application on Section 1(a) (use in commerce) but who did not use the mark on some or all of the goods or services identified in the application may 'cure' this problem by amending its basis to Section 1(b) (intent to use)." *Grand Canyon W. Ranch, LLC v. Hualapai Tribe*, 78 U.S.P.Q.2d 1696, 2006 WL 802407, at *3 (T.T.A.B. 2006) (footnote omitted). It turns out that the applicant in *Grand Canyon* had already "filed a motion to amend its application to delete the services for which opposer claims applicant did not use the mark as of the filing of the application," which meant that the "applicant ha[d] essentially agreed to accept judgment with respect to those services." *Id.* The TTAB then granted the applicant's motion to amend its application, rather than voiding the entire application. *Id.*

Contrast this with *Wet Seal*, the case which the majority views as extending *Grand Canyon*'s holding to § 1(b) ITU applications. In *Wet Seal*, the TTAB, citing *Grand Canyon*, broadly stated that "an application will not be deemed void for lack of bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them." *The Wet Seal, Inc. v. F.D. Mgmt.*, 82 U.S.P.Q.2d 1629, 2007 WL 458529, at *2 (T.T.A.B. 2007) (footnotes and citation omitted).

Importantly, the TTAB stated, "[W]e will decide this issue in terms of whether the items, if any, for which opposer has shown applicant's lack of bona fide intention to use the mark should be deleted from the application." *Id.*  At first blush, this would appear to support the majority's holding that the district court can decide, without the applicant's motion to amend its application, which items to strike from an ITU application.  Its pronouncement notwithstanding, the TTAB held in *Wet Seal* that the opposer "[fell] far short of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intention to use the mark in connection with any of the identified products," and dismissed the challenge on those grounds.  *Id.* at *14.  Therefore, the district court was correct in noting that the supposed adoption of *Grand Canyon*'s remedy in cases involving § 1(b) ITU applications was *dicta*; it was not essential to the determination of the case at hand.  *See Hinchman v. Moore*, 312 F.3d 198, 203–04 (6th Cir. 2002) (quoting Black's Law Dictionary 454 (6th ed. 1990)).[1]

Within this context, the district court's second holding was also correct: *Spirits International* remains truest to the import of *Grand Canyon*.  This is because the TTAB in *Spirits International* clearly reiterated *Grand Canyon*'s remedy, in which the "applicant could have moved to delete alcoholic beverages from its identification if applicant did not have a bona fide intention to use its mark in commerce with respect to such goods, but did with respect to non-alcoholic beverages."  *Spirits Int'l, B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 U.S.P.Q.2d 1545, 2011 WL 2909909, at *2 n.3 (T.T.A.B. 2011).  Unlike in *Wet Seal*, the opposer in *Spirits International* met its burden of production.  *Id.* at *4.  Thus, "[t]he burden . . . shifts to applicant to come forward with evidence which would adequately explain or outweigh the failure to provide such documentary evidence."  *Id.*  Because the applicant in *Spirits International* did not rebut the opposer's evidence that applicant lacked a bona fide intent as to *some* of the items in its application—and did not appear to move to amend its application as did the applicant in *Grand Canyon*—the TTAB sustained the opposition

---

[1] The majority opinion notes that while we are not bound by dicta, the dicta is not necessarily incorrect. (Maj. Op. at 24 (citing *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007))).  I agree. However, this does not mean that we should use dicta to determine the outcome of this case when there is no indication of how the TTAB would have disposed of the opposer's challenge in *Wet Seal* had (1) the opposer met its burden of production and (2) the applicant failed to provide objective evidence of bona fide intent as to *all* of the products in its application.

"solely on the ground that applicant lacks a bona fide intention to use the mark in commerce." *Id.* at *4–5. The majority's contention that *Spirits International* is limited to cases in which the applicant fails to produce any evidence that it had a bona fide intent as to any of the goods and services listed in the application misses the mark. (*See* Maj. Op. at 21–22.) The TTAB has continued to cite *Spirits* for the proposition that applications for which the applicant lacks bona fide intent even as to only *one* item will be voided in their entirety. *See, e.g.*, *Bryan Papé and Spello Group, LLC v. Me To We Social Enters., Inc.*, Opposition No. 91218595, 2016 WL 1642754, at *4 (T.T.A.B. Feb. 29, 2016) (non-precedential opinion) ("A lack of a bona fide intention to use the mark with respect to any of the goods or services in a class results in sustaining the Opposition against all the goods or services in that class.") (footnote omitted) (ultimately denying summary judgment for opposer because of existence of genuine issue of material fact).[2] I therefore do not believe that the majority's attempt to narrow *Spirits International* reaches the right result.

*Syndicat*, which Creative Harbor and the majority believe dictates the majority's remedy, only superficially conflicts with *Spirits International* or *Grand Canyon*. At the outset of its opinion in *Syndicat*, the TTAB noted, "During the oral hearing, counsel agreed that, should applicant's application otherwise be in condition for issuance, applicant would accept judgment on this issue and deletion of 'distilled spirits' and 'liquors' from the application." *Syndicat Des Proprietaires Viticulteurs de Chateauneuf-du-Pape v. Pasquier DesVignes*, Opposition No. 91179408, 2013 WL 5407284, at *1 (T.T.A.B. June 14, 2013). Then again, at the conclusion of its opinion, the TTAB stated, "As noted at the outset, applicant admits to its lack of a bona fide intention to use the applied-for mark on 'distilled spirits' or 'liquors.' Therefore, applicant is not entitled to register its mark for these goods." *Id.* at *14. The TTAB's remedy in *Syndicat*, as the

---

[2]The TTAB also cited *Spirits International* in conjunction with *Grand Canyon* in a case involving a § 1(a) use application. *See Yazhong Inv. Ltd. v. Multi-Media Tech. Ventures, Ltd.*, Cancellation No. 92056548, 2015 WL 9913815, at *3 n.8 (T.T.A.B. Dec. 18, 2015) (non-precedential opinion) ("We note that Respondent has not filed a motion to delete the goods and services for which there was no use prior to the filing dates of the Statements of Use. Absent a finding of fraud, a registrant which did not use the mark on all of the goods or services identified in the underlying application may 'cure' this problem by deleting from the registration the goods or services for which it had not used the mark as of the filing date of the application and accepting judgment with respect to the deleted goods or services. [Citing *Spirits International* and *Grand Canyon*] . . . *If a registrant fails to effect a cure to delete certain goods or services for which there was no use, and a petition is successful in proving non-use with respect to any of the goods or services in that class at the time of application (or in this case, when the Statements of Use were filed), the Board proceeding will be sustained against the class in its entirety.*" (emphasis added)).

majority correctly cites, was to amend the application "to reflect those goods with which [applicant] has a bona fide intent to use the mark . . . ." *Id.* at *15. Instead of being some new remedy at odds with *Spirits International* or a remedy fashioned in the mold of *Wet Seal*'s dicta, this resembles the remedy that the TTAB used in *Grand Canyon*, in which the applicant had moved—prior to entry of the judgment—for an amendment to its § 1(a) use application.

*Spirits International* essentially applied the *Grand Canyon* rule, and so the majority's opinion that the district court "misread" *Spirits International* or failed to apply "the more forgiving rule articulated in *Grand Canyon*" does not make sense. (Maj. Op. at 19.) The district court expressly found that Creative Harbor's "modest" offer to amend its applications to eliminate one service and one good did "not cure the material overbreadth in Creative Harbor's listing of the goods and services on which it claimed an intent to use the Mark." The district court continued, "Indeed, even with Creative Harbor's proposed deletions, the Creative ITUs still list services (*e.g.*, employee relations information services, business consulting, professional credentialing verification services) and goods (*e.g.*, computer game software, computer hardware for integrating text and audio) on which Creative Harbor lacks a firm intent to use the Mark."

TTAB precedent suggests that it is incumbent upon the applicant to amend its application to eliminate portions of its § 1(b) ITU application for which it cannot demonstrate bona fide intent, or else risk having the entire application voided. Creative Harbor refused to take advantage of this remedy. The district court therefore correctly voided both of Creative Harbor's applications *ab initio*. Because my colleagues reach the opposite conclusion, I respectfully dissent.